UNITED STATES (PENDLETON v.). See Case No. 10,924.

---

## Case No. 16,024.

### UNITED STATES v. The PENELOPE.

[2 Pet. Adm. 438.] 1

District Court, D. Pennsylvania. 1806.

NON-INTERCOURSE LAWS — TRADING TO ST. DO-MINGO—PERSONS "RESIDENT" IN THE UNITED STATES.

[A British subject living in Bermuda, who came to Philadelphia in his own sloop to take his children home from school, and who, after remaining in the United States 13 days, purchased a cargo for St. Domingo, was not a person "resident within the United States," and therefore not within the prohibition of the act suspending commercial intercourse with certain parts of the Island of St. Domingo. 2 Stat. 351.]

[Cited in Burnham v. Rangeley, Case No. 2,-176.]

[Cited in brief in People v. Cady (N. Y. App.) 37 N E. 673.]

This was an information filed by A. J. Dallas, Esq. against the schooner Penelope and

1 [Reported by Richard Peters, Jr., Esq.]

her cargo for a supposed breach of the first section of the act of congress, entitled "An act to suspend the commercial intercourse between the United States and certain parts of the Island of St. Domingo." [2 Stat. 351.] The facts of the case were these: Mr. Richard Wood, a native of Bermuda, and who had been established there for a great number of years, in partnership with Mr. Joseph Wood his brother, both British subjects, and owners of the sloop Penelope, had during the year 1805, placed his children at school in Philadelphia. Previous to this circumstance, Mr. R. Wood had not been in the United States for many years. With a view to take his children back to Bermuda, and not contemplating any particular commercial enterprise, he came to Philadelphia, on board the Penelope, on the eighteenth day of May, 1806. He found, after his arrival, the law prohibiting intercourse between the United States and certain parts of St. Domingo, in force; and at the instance of some of his friends, and exclusively on his own account, the Penelope took on board a cargo calculated for the markets of the prohibited island. This cargo was purchased by himself, and by Mr. Edward Russel, his brother-in-law, and paid for by Mr. Russel out of the funds of Joseph and Richard Wood. During his stay in Philadelphia, Mr. R. Wood remained at the house of Mr. Russel; and thirteen days after his arrival in Philadelphia, he sailed with his children for Bermuda, where he landed, and ordered the Penelope to Cape François. The Penelope entered Cape François under the American flag, in order, as it was said, to prevent her being interrupted by the British cruizers; but her British register was lodged at the custom-house there; and having disposed of her cargo, she received another on board, and returned to Philadelphia on the twenty-seventh day of August, 1806. She was immediately seized, and the present information was filed.

The cause was tried by a special jury, before the district court, on the 26th day of September. On the part of the claimants of the Penelope, it was said, that the only persons who were objects of the law prohibiting intercourse with St. Domingo, were citizens of the United States, or residents in the same; and that the short visit of Mr. R. Wood for the purpose before stated, and his short stay in Philadelphia, did not bring him within the meaning of the term "resident."

Mr. Dallas (district attorney) in support of the information, considered, first, the facts; and second, the law.

First, the facts. The sloop Penelope sailed from Philadelphia, touched at Bermuda, and went to Cape François, after the non-intercourse act was notified at the custom-house; and returned directly from the Cape to Philadelphia. If, therefore, she was owned, or employed, in part, or in whole, by a person resident within the United States, the

voyage was unlawful, and the vessel was forfeited. The evidence on the point of ownership and residence proves, that the sloop was in part the property of R. Wood, a British subject, who came in her from Bermuda to Philadelphia, where he remained for several days; that while he was here, he shipped a cargo, through the medium of American merchants; that he returned in her to Bermuda (Capt. Dunscomb commanding her both when she sailed from and returned to Philadelphia), and then sent her on, with the cargo, to the Cape; that by the custom-house papers of the Cape she was described as "the American sloop Penelope of Philadelphia, Capt. Hatchet;" and that, consequently, for the purposes of the voyage, she had changed her ownership, her captain, and her flag.

Second, the law. From these facts it was urged, that the case came clearly within the pre-existing mischief of a trade, between the United States and the rebellious parts of the Island of St. Domingo, which the legislature meant to suppress; that it was within the scope of the particular remedy provided, as well as within the general spirit and policy of the law. That Wood, who owned and employed the sloop, in the voyage to Hayti, was resident, in fact, within the United States, at the time of her departure from Philadelphia, cannot be denied; but, it is contended, that a resident within the meaning of the act of congress, applies not to occasional, and transient visitors, but only to permanent, domiciliated inhabitants of the United States. In refutation of this defence, however, it was endeavored to fix upon a contrary ground, in the legislative sense, as well by a review of the mischief declared, the remedy provided, and the object of the law, as by the consequences of the claimant's doctrine; the provisions contained in acts of congress, in pari materia, particularly in the non-intercourse acts of 1798, 1799, and 1800 (4 Laws [Folwell's Ed.] 129, §§ 1–3, 5 [1 Stat. 565]; 4 Laws [Folwell's Ed.] 244, §§ 1–3 [1 Stat. 613]; 5 Laws [Folwell's Ed.] 15, §§ 1, 2 [2 Stat. 7]), and the legislative use of the word "resident," upon analogous subjects. (2 Laws [Folwell's Ed.] 132, §§ 2, 3, 5 [1 Stat. 287]; 2 Laws [Folwell's Ed.] 142, §§ 11, 17 [1 Stat. 292]; 3 Laws [Folwell's Ed.] 163, §§ 1, 2 [1 Stat. 414]; 4 Laws [Folwell's Ed.] 134 [1 Stat. 566].

Mr. James S. Smith, for the claimants.—The present case is important not only on account of the value of the property seized, but because it is the first in which an act materially affecting the mercantile interest has received a judicial examination. Yet it lies within a narrow compass, and turns upon a single point, viz. was the Penelope "owned, hired or employed," &c. by any person resident within the United States.

In discussing this point it is proper to enquire—(1) What constitutes a residence, or who is meant by the term "resident." (2)

Was the Penelope "owned, &c. by any person resident within the United States." The word "resident" is defined by Dr. Johnson, "Dwelling or having abode in any place."—Johnson's Dict. It will not be contended on the part of the United States, that Philadelphia was Mr. Wood's dwelling place; yet, according to Johnson, dwelling place and place of residence are synonymous. Johnson's Dict. "dwell," "dwelling," "dwelling place." So too, "inhabitant" and "resident" are synonymous.—Johnson's Dict. Who is an inhabitant has been judicially decided. "A person coming hither occasionally as a captain of a ship, in the course of trade, cannot be called an inhabitant; nor does a person going from his settled habitation here, on occasional business to Boston, or elsewhere, cease to be an inhabitant." [Barnet's Case] 1 Dall. [1 U. S.] 153. Being resident at a place, means then, having a family there, a home, transacting business there, and above all, its being the place to which, when absent from it, a man always proposes to return. Such is not only the strictly correct meaning, but also the common acceptation of the word. What more common than the question, Where do you reside? What more absurd if "resident" means merely "being present." But "residence" is a term that has a definite legal meaning, established by numerous decisions. By an act of the legislature of Pennsylvania freeholders are exempted from arrest except in certain cases, one of which is where they have not been residents in the state for the space of two years next before the issuing of the writ. Yet the supreme court determined that a man who was in Georgia fifteen months previous to the issuing of the writ did not lose his privilege, because his family was here, and he meant to return. [Penman v. Wayne] 1 Dall. [1 U. S.] 241, 348. So too, in the case of a foreign attachment which can only issue where the defendant does not reside within the state, the court refused to quash the attachment only because it did not sufficiently appear that the defendant intended to return. [Taylor v. Knox] 1 Dall. [1 U. S.] 158. Similar case 2 N. Y. Term R. [2 Caines] 318.

By the constitution of Pennsylvania, art. 1, § 3, no person residing within any city, &c. which shall be entitled to a separate representation, shall be elected a member for any county. Suppose the case of a merchant whose counting house is in the city, and dwelling house in the county; he spends a great proportion of his time in the city; and, therefore, if the district attorney's construction of the term "resident" is correct, is eligible. Nay, according to that construction, it would only be necessary that he should remain in the city on the day of election. But admitting that the common acceptation of the word and its legal technical meaning are different, we must presume that congress meant to adopt the latter. This is a highly penal statute; it subjects to for-

feiture the property of innocent persons knowing nothing of the vessel having been at St. Domingo, which may be on board at the time of her return to the United States. It is, therefore, according to a well established rule, to be construed strictly. 1 Bl. Comm. 88. To discover the intention and construction of congress, statutes in pari materia have been referred to. Not one, however, has been cited that will support the construction contended for on the part of the United States. Wherever the intention of congress clearly was to include persons actually within the United States, and not technically residing there, they have used other words in addition to that of resident.

The act to suspend the commercial intercourse with France (4 Laws [Folwell's Ed.] 129 [1 Stat. 565]), is in general terms like the present. "No persons resident," &c.; and it has been asserted, that like it, it applied to all persons within the United States. Congress, however, when it was about to expire, instead of merely passing an act to continue it, passed one in more general terms, thereby shewing their construction of the former act. Act Feb. 27, 1800; 5 Laws [Folwell's Ed.] 15 [2 Stat. 7]. In that act we find the phraseology materially altered, "persons resident within the United States or under their protection," that is, persons actually within the United States, but who do not reside there. The local or temporary allegiance which an alien owes to the government within whose territories he is, and the consequent protection of his person and property by that government, are alluded to in the phrase used. No term could have been more properly applied to aliens transiently within the United States. It is said, however, that citizens of the United States resident in foreign countries were meant.—Not so: the next sentence provides for their case. The phraseology is again varied to apply to them:—"Citizens of the United States resident elsewhere." That the phrase was intended to apply to persons who did not technically reside within the United States, appears also from the second section of the act, which allows a clearance to vessels owned, &c. by persons "permanently residing in Europe;" that is not merely those persons within the United States whose place of residence is Europe, but those who have not left it. The title of that act deserves to be noticed. It is as general as the title of the act upon which this information is founded, which has been referred to to support the construction contended for on the part of the United States. Both are entitled, acts "to suspend the commercial intercourse," &c. yet in both we find excepted cases in which an intercourse is allowed, and a clearance may be granted. The title, therefore, does not in the least explain the intention.

The act to prohibit the carrying on the slave trade (Act March 22, 1794, p. 22 [1 Stat. 347]) makes a distinction between persons coming into, or residing within the United States. The naturalization act (6 Laws [Folwell's Ed.] 76 [2 Stat. 153]) requires, that persons applying to become citizens shall prove that they have resided five years within the United States, and one year within the state in which they apply. If "resident" means being personally present, those aliens who have been out of the state for one day during the year, could not be admitted. Such, however, has not been the construction given to the act.—Mariners are daily naturalized. They are considered as residents because they have families within the United States, and always propose to return. But waving further comparison with other acts, we assert that the intention of congress is apparent upon the face of the act itself. Had they meant to prohibit all persons within the United States from trading to St. Domingo, they would have omitted the word "resident," altogether. Their meaning then would have been clear, and much more forcibly expressed. It is a rule in the construction of statutes that they are to be so construed, that, if possible, every word may stand and have a meaning. 1 Bl. Comm. 88. This rule can be complied with in the present case only by adopting the construction contended for by the claimants.

It has been said, however, that the words "resident within the Island of St. Domingo," are also used; that the same construction must be given to "resident" wherever it occurs; and that if our construction is adopted, a person resident within the United States may trade to St. Domingo with a person not domiciliated or legally resident there. The same construction must undoubtedly be given to the term "resident" in both cases, but the consequence asserted will not follow. Residents within the United States, are not only prohibited from having any commercial intercourse with persons resident within the Island of St. Domingo, but their vessels are liable to forfeiture if they are carried, or destined to proceed to any port within that island.

The construction contended for on the part of the claimants renders the whole act intelligible and consistent, and therefore must be presumed to be correct.

(Mr. Smith, in reply to the observations of the district attorney, commented upon the evidence to shew that only British funds were employed—that the claimants did not act in a clandestine manner, &c.)

Mr. Tilghman was about to proceed in the argument on the part of the claimants of the Penelope and cargo, when the jury mentioned that they had already made up their minds in the case. The court was requested to give a decided direction to the jury on the law, in order to afford an opportunity to either party to remove the cause to another tribunal.

Mr. Dallas, for the United States.

Mr. E. Tilghman, Mr. Smith, and the Reporter, for the owner of the Penelope and cargo.

THE COURT (charging jury). I do not think that this case, being one I have not had much time to consider, should be left to rest on my opinion. Although not one so well digested, as more deliberation would have enabled me to deliver, I shall give a direction sufficiently decided to afford an opportunity of taking an exception to it. My habit is not to leave points of law to the jury; it being the province and duty of the court to take on itself the responsibility for them, where time is afforded to form a deliberate opinion; which can seldom be done in the hurry of a trial in new and extraordinary cases. In this case it is not necessary for you to embarrass yourselves (nor shall I set the example) with passing in review all the acts of congress alleged to be in pari materia. It is considered to be a proper course to pursue in argument by counsel, but it is a dangerous and unnecessary conduct for courts, to decide on a number of acts said to be in pari materia, when a question arises only on a construction of one. These acts may (as some of them have been) be brought before me for construction directly, and it would be unsafe to commit myself by an incidental opinion. Every law has something peculiar in its intention and object; the same words may on some subjects be of different import from that in which they are used on others. I often find one at a time an over match.

I join the counsel on both sides in recommending to you to divest yourselves of all political considerations and consequences. The only point is that of a forfeiture; and the only enquiry is whether the individual whose property is placed under your view, is of the description intended by the law to incur it. The facts are fairly and fully in proof. The arguments and suspicions adduced to suggest ideas of the investment of American capital, used for the outfit or lading of the vessel in question, are not conclusive, or grounded in proof: they are out of the case. A British subject, owning a British vessel, comes into a port of the United States with private views, to wit, to convey home his children, who had been placed here for education: having funds and commercial credit in our city, he was advised to use them in an enterprise inhibited to our own citizens, but, as he was taught to believe, not forbidden to aliens. On whatever ground he formed his opinion, he must take the risk attending it. Arguments of innocent, or mistaken intention, are to be used in applications for mitigations of forfeitures; but are here irrelevant. The power of relieving from penalties, is in another department. He had the law before him, and must hazard the consequences of any act which produced an infraction of it. What were his motives is not, with us, so material, as what were his actions. It seems clearly proved that he did not come here to establish his domicil; but for a particular and transient purpose. There seems no disagreement about the general meaning of the words "inhabitant and resident," but it is said that the act of congress, under consideration, means any personal residence, while the business was in operation which incurs the forfeiture. A commorancy for the shortest time is held to be a residence, to bring the person within the act. The words are not "residing or being," but "person resident," throughout. Other acts of congress wherein the word, or words, are used, are brought to explain this; and yet they may, on examination, be found to be as deficient in perspicuity as this; which, on some future occasion, may be enlisted to explain them. Reasoning founded on the pari materia plan, is frequently a petitio principii, a begging question, or expounding one of unknown or doubtful expression, by another. The act produced to elucidate, is as little clear as the other. I recollect no direct judicial decisions on those acts, affecting the point now before us. It is true that persons "being" within our jurisdiction, owe allegiance as it respects crimes, for the commission whereof they are punishable. But this is an highly penal act, and must have a strict construction. Here is a forfeiture declared in the case of a person, not only actually "being," but one who must be described by the words "any person or persons resident within the United States," to be included in its purview. Congress may have intended to comprehend one "residing or being." If resident means nothing but mere momentary commorancy, where it is even coupled with "being," it might as well be left out. The question seems to be whether they inserted "resident" without the legal meaning generally affixed to it. If they have omitted to express their meaning, we cannot supply it. Our duty is to expound, and not to make acts of congress. In so penal a case what can we do better than to take the legal interpretation? That I may not mistake, I will read, from notes in other cases, what I have said on a similar point, over and over again. In the case of Hylton v. Brown [Case No. 6,981] in the circuit court, and cases in this court, the following has always been my definition of the words "resident," or "inhabitant," which, in my view, mean the same thing. "An inhabitant, or resident, is a person coming into a place with an intention to establish his domicil, or permanent residence; and in consequence, actually resides: under this intention he takes a house, or lodgings, as one fixed and stationary, and opens a store, or takes any step preparatory to business, or in execution of this settled intention.

The time is not so essential as the intent executed, by making or beginning the actual establishment, though it is abandoned, in a short or longer period." A mere transitory coming for a special purpose, a mere transient visit, does not fall within the legal meaning of the word "resident." He must have the intent of staying, or abiding, for permanent purposes; and begin it, though he does not continue to prosecute it. On the meaning, if doubts exist in common interpretation, we must be governed by the legal definition. The attorney of the district does not consider it a clear case, because he has taken great pains, and brought together a mass of information. For the purpose of affording opportunity for exception to my opinion, though I have had no time to consider it maturely: I say that this claimant is not a "resident," or within the meaning of the act of congress on which the prosecution is founded. It is a case of great importance in its consequences, and ought to be well considered. Though I have thus directed you, this being a case partaking of crime, a malum prohibitum, though not morally criminal, you have, perhaps, a latitude both as to law and fact; and under all these circumstances, and with this opinion of the law, I leave you to decide according to your unbiased judgments.

Verdict for the claimants.

No appeal was prosecuted in this case.